NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0646n.06

Case No. 17-1006

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Nov 22, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DWAYNE TOLAND, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: SILER, WHITE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. A jury convicted Dwayne Toland of conspiring to distribute heroin. He raises a bevy of challenges to his conviction and sentence. Since none of them have merit, we affirm.

I.

Drug empires are hard to build. Dwayne Toland, however, hoped to get a "little empire rolling." R. 125-1, Pg. ID 1173. So he joined forces with Bernardo Santana, the kingpin of a heroin-trafficking enterprise based out of the Dominican Republic. Santana would procure large quantities of heroin and split them among multiple distributors in Detroit, including Toland. Toland would then broker sales to Detroit-area buyers.

But unlike diamonds, drug empires do not last forever. Eventually, the government catches on. And this case was no different; the government began an investigation of Santana

that ultimately included wiretapping his phone. The wiretap captured numerous conversations between Santana and Toland. In these conversations, Santana and Toland discussed several heroin deals—past, present, and future.

Nowhere in these conversations did Santana or Toland say "heroin." Rather, they spoke cryptically, discussing whether Santana should procure three "person[s]" or "a lot of family," *id.* at Pg. ID 1175, the availability of "documents," *e.g.*, *id.*, and Toland's friend's complaint that "what he had got . . . was a little damp and stuff" and that "it was moist," *id.* at Pg. ID 1218. But as DEA agent Jared Sullivan explained to the jury, these words and phrases are part of a narcotics-trafficking code. Heroin traffickers "seldom, if ever," actually mention heroin by name. *See* R. 98, Pg. ID 497. Instead, "people" and "family" represent kilogram quantities of the drug, while "documents" is code for money. And Toland later confessed that the complaints of moistness referred to the heroin.

The wiretap also recorded conversations both with and regarding Burton Norfleet, another distributor in Detroit. Norfleet's name first came up when Santana called Toland hoping to send "three or more . . . family." R. 125-1, Pg. ID 1175. In response, Toland said he was "trying to find out a little more info about . . . Burt" because "[Burt] just kind of threw [him] off." *Id.* at Pg. ID 1175–76. Santana shared his skepticism. But something must have transpired to assuage Santana's concerns. He later sought Toland's help in finding Norfleet, who had gone missing. Santana called Toland to get Norfleet's number. But Toland did not have the number on hand and needed to go home to look for it. So Santana told him to contact Norfleet when he found the number and have him call Santana. But by the time Toland let Santana know he could not find the number, Norfleet had already called Santana, explaining that he had been on vacation. The two then arranged for Santana to send Norfleet "two persons."

In addition to the wiretap, the government presented evidence of Toland's role in a transaction involving Ernesto Lebron. Lebron testified about an instance in which Santana instructed him to deliver three kilograms of heroin to Javier Martinez, one of Santana's couriers. Lebron and Martinez drove the heroin, hidden in a jeep, to Detroit. Once there, Martinez took the jeep to Toland, who housed it in his garage. The jeep remained in Toland's garage overnight while Toland came and went. Shortly after Martinez retrieved the jeep, DEA agents stopped and searched it. They discovered $133,000 in cash hidden inside.

Phone records had revealed that Norfleet and Toland were in contact immediately before Martinez and Lebron's trip to Detroit. So, suspecting that Toland may have delivered some of the heroin to Norfleet, agents executed a search warrant at Norfleet's home. They found nearly 800 grams of heroin, roughly $20,000 cash, scales, a vacuum sealer, an electric money counter, and a gun.

Agents could have searched Toland's house the same day. But they were concerned that Santana might realize they were onto him if they did. The agents therefore elected to wait two-and-a-half months before they temporarily detained Toland and searched his home. When they did, they recovered a digital scale, a vacuum sealer and vacuum-sealer bags, a money counter, Latex gloves, and five guns.

Several years then passed before the government sought charges against Toland, evidently to permit the investigation to proceed toward arrest and apprehension of Santana himself. Around this time, a DEA agent interviewed Toland. According to the agent, Toland admitted to knowing Santana since the 1990s and "broker[ing] heroin transactions" between Santana and a friend. R. 101, Pg. ID 705–06.

A grand jury indicted Toland, Norfleet, and two others with conspiring to possess and distribute heroin, along with other charges. After Norfleet reached a plea agreement with the government, the government filed a superseding indictment naming Toland alone. At trial, a jury acquitted Toland of a gun charge but found him guilty of conspiracy. The judge sentenced him to 140 months' imprisonment, based in part on a finding that Toland's offense involved at least three kilograms of heroin. Toland now appeals.

II.

*Sufficiency of the Evidence*. As an initial matter, Toland challenges the sufficiency of the evidence. To convict a defendant of conspiracy under 21 U.S.C. §§ 841(a)(1) and 846, the government must prove "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Wettstain*, 618 F.3d 577, 584 (6th Cir. 2010) (quoting *United States v. Gibbs*, 183 F.3d 408, 420 (6th Cir. 1999)). In reviewing this challenge, we view the evidence in the light most favorable to the government, and decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Toland does not challenge the existence of the Santana conspiracy. Instead, he claims that he did not know of or participate in the conspiracy and that the government convicted him for nothing more than "guilt by association." The evidence says otherwise. Toland regularly brokered large transactions on Santana's behalf, sometimes receiving heroin on credit. *See United States v. Robinson*, 547 F.3d 632, 641 (6th Cir. 2008) (observing that repeat transactions, the quantity of drugs involved, and credit-based transactions are probative of knowing participation in a drug conspiracy). The search of his house produced items consistent with heroin trafficking. And the evidence also connected Toland to Norfleet and Lebron, illustrating

that Toland knew Santana's operation in Detroit was bigger than himself and that he participated in it. While Toland may not have known everyone involved, he did not have to in order to be guilty of conspiracy. *Id.* The evidence was therefore sufficient to support his conviction.

*Co-Conspirator Statements*. Toland next maintains that certain out-of-court statements of his co-conspirators were inadmissible. Over his objection, the district court permitted the government to introduce wiretap recordings of Norfleet's conversations with Santana, as well as Lebron's testimony that Santana told him to give heroin to Martinez. In both instances, the district court admitted the statements under Federal Rule of Evidence 801(d)(2)(E)—which excepts certain co-conspirator statements from the rule against hearsay—but failed to make the preliminary findings that Rule 801(d)(2)(E) requires. These findings are that "(1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009). The government must establish these findings by a preponderance of the evidence. *Id.* And when a district court fails to make these findings, remand is necessary unless we can "conclude with confidence" that the government sustained its burden. *Id.* at 336–37.

The first two requirements are easily met. Toland's conversations with Santana, Toland's admissions, and the evidence recovered at Toland's house prove that a conspiracy existed and Toland was part of it. This leaves the third requirement: that Norfleet and Santana made the statements at issue in furtherance of the conspiracy. A statement is made in furtherance of the conspiracy if the speaker makes it in order to promote the conspiracy's objectives. *Id.* at 338. Here, Norfleet told Santana that he needed two "persons" and that his "money is always right and fresh." R. 125-1, Pg. ID 1210, 1212. And Santana told Lebron to give heroin to Martinez, who then took it to Toland. Both co-conspirators' statements, therefore, were made in

furtherance of the conspiracy. *See United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005) (explaining that "[s]tatements that prompt a coconspirator to act in a matter that facilitates the carrying out of the conspiracy" are made in furtherance of the conspiracy). Thus, while the district court erred in failing to make the necessary findings under Rule 801(d)(2)(E), we conclude with confidence that it would have.

*Variance*. Toland further argues that the government produced evidence of multiple conspiracies that varied from the single conspiracy alleged in the indictment. If such a "variance" occurred and prejudiced Toland, he would be entitled to reversal of his conviction. *United States v. Hughes*, 505 F.3d 578, 587 (6th Cir. 2007). But the time to raise a variance is at trial, *United States v. Wilson*, 168 F.3d 916, 923 (6th Cir. 1999), which Toland failed to do. So he is entitled to relief only if he can show plain error—one that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

The number of conspiracies depends upon whether a common goal united co-conspirators, the nature of their scheme, and the overlap of participants among dealings and transactions. *Warman*, 578 F.3d at 341–42. We view the evidence in the light most favorable to the government. *Id.* at 342. According to Toland, the government proved distinct conspiracies between Toland and Santana, Santana and Norfleet, and Santana and Lebron. But the government's evidence was sufficient to establish a common goal (distributing heroin in Detroit from Santana down), a scheme to achieve it, and overlap among Santana, Toland, Norfleet, and Lebron. The evidence, therefore, does not plainly establish a variance.

*Expert Testimony*. Toland's final trial-related challenge is to the testimony of DEA agent Jared Sullivan. Recall that Sullivan's testimony aimed to decipher coded wiretap recordings—to

suggest, for example, that "three persons" meant "three kilograms of heroin." Toland objected that Sullivan was not qualified to testify as an expert, that his testimony was unhelpful to the jury, and that it was irrelevant. The judge overruled the objections, which Toland renews here. We review the judge's rulings for abuse of discretion. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).

Sullivan, an eleven-year DEA veteran with extensive experience investigating narcotics conspiracies and conducting wiretaps, was qualified. *E.g.*, *United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (holding that an agent with less experience was qualified to give expert testimony on drug trafficking). His testimony was both reliable and helpful to the jury. *See United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) (observing that expert testimony interpreting drug traffickers' "codes[] and jargon" is helpful just as "a trained observer on the baseball diamond might be able to point out the bunt sign among an array of otherwise meaningless scratches and touches by the third base coach"). And the testimony was relevant because it tended to make more probable that the conversations, which contained numerous code words, were about heroin trafficking. That in turn increased the likelihood that Toland was involved in a heroin-trafficking conspiracy. Fed. R. Evid. 401. The district court did not abuse its discretion in admitting Sullivan's testimony.

Toland also says the district court erred in permitting Sullivan to testify both to his expert opinion and the facts of the case. When law-enforcement agents testify in such a dual role, courts must ensure that the jury does not get confused by their dual role. *United States v. Rios*, 830 F.3d 403, 414 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 1120 (2017) (mem.). To do so, courts should provide a cautionary instruction or ensure there is a "clear demarcation" between the witness's fact and opinion testimony. *United States v. Ham*, 628 F.3d 801, 806 (6th Cir. 2011)

(quoting *United States v. Smith*, 601 F.3d 530, 540 (6th Cir. 2010)). Here, the trial judge gave a detailed cautionary instruction delineating Sullivan's dual roles before his testimony and echoed the instruction before deliberations. In addition, the prosecutor clearly demarcated Sullivan's testimony on direct examination into broad sections of fact and expert opinion. And to further aid the jury, he regularly prefaced questions with "[b]ased on the investigation" and "[i]n your training and experience" in order to signal the type of testimony sought. *E.g.*, R. 98, Pg. ID 483, 498. In light of the judge's instructions and the prosecutor's clear demarcation, there was no abuse of discretion in permitting Sullivan's dual testimony.

*Speedy Trial*. In addition to perceived flaws at trial, Toland raises three arguments that his trial did not begin soon enough. Precedent forecloses the first two, and the third is premature.

Toland first argues that too much time passed between the time he was temporarily detained in connection with the search of his home and his indictment. He points to Section 3161(b) of the Speedy Trial Act, under which an indictment must be filed within thirty days of arresting the individual "in connection with such charges." 18 U.S.C. § 3161(b). As he concedes, however, longstanding precedent establishes that his temporary detention does not constitute an "arrest" for purposes of the Speedy Trial Act. *See United States v. Salgado,* 250 F.3d 438, 454 (6th Cir. 2001) ("A defendant is not 'arrested' for purposes of the Speedy Trial Act until formal federal charges are pending."). Formal charges were not pending at the time of Toland's detention. And so we must reject this argument. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (noting that a prior panel decision is controlling absent an inconsistent Supreme Court decision or this court overruling the decision en banc).

Toland next attempts to invoke his Sixth Amendment right to a speedy trial. But this second argument fails for similar reasons. At the time of Toland's detention, criminal

proceedings had not been initiated against him, and his Sixth Amendment right had not yet attached. *United States v. Loud Hawk*, 474 U.S. 302, 310 (1986); *United States v. Sanders*, 452 F.3d 572, 579 (6th Cir. 2006). Toland concedes as much in his reply brief.

Toland's third argument is that his trial did not begin within seventy days in violation of Section 3161(c) of the Speedy Trial Act. 18 U.S.C. § 3161(c)(1). He acknowledges, however, that his counsel forfeited this argument by failing to raise it below. *See id.* § 3162(a)(2). Toland therefore repackages the claim as one of ineffective assistance of counsel. But ineffective-assistance claims are premature on direct appeal "except in rare cases where the error is apparent from the existing record." *United States v. Wells*, 623 F.3d 332, 348 (6th Cir. 2010) (quoting *Lopez-Medina*, 461 F.3d at 737). Here, it is not. Each side presents plausible arguments concerning whether a Speedy Trial Act violation occurred and, if so, whether that error would result in dismissal of the indictment with prejudice. Not only that, but without an evidentiary hearing, we cannot determine whether any alleged error by Toland's counsel is attributable to reasonable trial strategy or is constitutionally problematic. *See id.* We therefore decline to address Toland's ineffective-assistance argument.

*Sentence*. Finally, Toland challenges his sentence. He claims that the district court based his sentence on too large of a quantity of heroin: at least three kilograms. But for sentencing purposes, a drug quantity need only be established by a preponderance of the evidence, and estimates are permitted. *Warman*, 578 F.3d at 351. And in making this estimate, the court can include amounts related to reasonably foreseeable transactions of co-conspirators. *United States v. Okayfor*, 996 F.2d 116, 120–21 (6th Cir. 1993) (per curiam). We review the district court's finding for clear error. *Warman*, 578 F.3d at 350.

The record supported the district court's finding that Toland's offense involved at least three kilograms of heroin. In one recorded phone call, Santana told Toland that he wanted to send at least three kilograms of heroin. Toland asked for all three kilograms. In addition, Lebron testified that he transported three kilograms from Chicago to Detroit, where Toland housed it in his garage. And in another transaction, Toland agreed to have Norfleet contact Santana. Norfleet requested two kilograms from Santana. These latter amounts were reasonably foreseeable to Toland, given his participation in the transactions and his history of dealings with Santana and Norfleet. To that end, while Toland did not know the specific details of Norfleet and Santana's arrangement, he knew the quantities of heroin in which Santana typically dealt and Santana's likely purpose in contacting Norfleet. Thus, the district court did not clearly err in determining that Toland's offense more likely than not involved at least three kilograms of heroin.

\* \* \*

We **AFFIRM** Toland's conviction and sentence.